# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
## June 2, 2015 Session

## STATE OF TENNESSEE v. MARIO NORFLEET and TERENCE MITCHELL

**Appeal from the Criminal Court for Shelby County**
**No. 11-06148     Chris Craft, Judge**

_____

**No. W2014-00780-CCA-R3-CD  -  Filed November 23, 2015**

_____

A Shelby County jury convicted Mario Norfleet and Terence Mitchell of theft of property valued at more than $60,000.  The trial court sentenced Defendant Norfleet, as a career offender, to serve thirty years in the Tennessee Department of Correction.  The trial court sentenced Defendant Mitchell, as a standard offender, to eight years suspended to ten years of probation after the service of ten months and twelve days in jail.  On appeal, Defendant Norfleet asserts that: (1) the State made improper statements during closing argument to the jury; (2) there is a variance between the indictment and the evidence presented at trial; (3) the trial court failed to properly instruct the jury on the lesser-included offense of attempted theft; and (4) the trial court improperly sentenced Defendant Norfleet as a career offender.  Defendant Mitchell also challenges the prosecutor's statements made during closing argument as improper, but additionally asserts that: (1) the evidence is insufficient to sustain his conviction; (2) the trial court improperly admitted testimony from a witness that referenced his gang affiliation; (3) the trial court improperly ordered restitution; and (3) the cumulative effect of these errors deprived him of a fair trial.  After a thorough review of the record and applicable law, we affirm the trial court's judgments but remand for the entry of a corrected judgment pertaining to Defendant Mitchell's order of restitution.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for a Corrected Judgment**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Mario Norfleet.

Lance R. Chism (on appeal) and Charles Waldman (at trial), Memphis, Tennessee for the appellant, Terence Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Rachel Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Byron Winsett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the theft of furniture from a warehouse where items were stored for Fox Lane Furniture in Memphis, Tennessee. A Shelby County grand jury indicted the defendants for theft of property valued at more than $60,000.[1] At the trial for these charges, the parties presented the following evidence: Robert Landshof, the sole proprietor of Fox Lane Furniture, testified that he started his furniture business in Memphis, Tennessee, in 1970. He explained that he operated a 15,000 square foot showroom located on Winchester Road and a warehouse located on Barton Drive. Mr. Landshof had owned the three-story warehouse since 1997 and said he stored "[m]illions of dollars' worth" of furniture inventory in the warehouse.

Mr. Landshof testified that, during the time period of September 2010 to January 2011, he experienced "considerable loss" to his inventory due to multiple "break-ins" of his warehouse. About these break-ins, Mr. Landshof stated:

> The first incident was noticed in the first part of September of 2010. The front door lock to the warehouse has a steel cover plate that sort of covers the area where the deadbolt goes into the frame. And that steel cover plate was chiseled off allowing someone to pry the deadbolt back and gain access to the building.
>
> . . . .
>
> We called the police immediately . . . and had them come out and you know, the documentation was started at that date, the problem was, we repaired that lock, we reinforced that lock, and over the next five months, every door - - there's like six different doors to the building, every single door was smashed, broken, chopped, whatever manner, I couldn't stop it.

Mr. Landshof stated that he placed additional locks to the doors and added cables and chains, both of which were "easily cut." "Out of desperation" he attempted to cement a

---

[1] Co-defendants Lavell Mitchell, Ronald Evans, and Deven Shives were also indicted for this offense but are not participants in this appeal.

2

rear door that went into the basement of the building but ultimately just "reinforced" the doors. Mr. Landshof sat in his pickup truck some nights and watched the warehouse in an attempt to figure out how "massive amounts of furniture" was being removed from his warehouse.

Mr. Landshof testified that, although it was not initially apparent, he finally determined that the intruders had removed a sheet of metal covering the rear windows on the building and "chopped" a hole through one of the windows, providing a small opening into the basement. After entry, the intruders would replace the sheet metal to obscure detection. Once someone was inside the building, the bar on an exit door could be pushed to get out of the building. Mr. Landshof testified that the total value of the furniture taken during the numerous break-ins was "in excess of seven hundred and fifty thousand dollars." He described the warehouse as "in a shambles" with items ripped out of the boxes, items smashed, and items broken. He recalled that he found a section of the warehouse that "might hold thirty beds" with all the boxes intact but empty.

Mr. Landshof testified that, in mid-January 2011, at the request of a Memphis Police detective, he drove to a residence on Whittaker Drive in Memphis, Tennessee. Upon entering the residence, Mr. Landshof found that "it was very obvious" that it was his inventory in the residence. Mr. Landshof recalled that the residents of the home were present and that he did not know any of them nor had he given any of them permission to take the furniture to the residence on Whittaker Drive. Mr. Landshof said that the two-story house and garage were full of the stolen furniture and there were stolen items in the backyard. He said that he found it "most disconcerting" to see the furniture outside because the winter weather and elements were destroying the furniture. Mr. Landshof identified photographs taken of the stolen furniture at the Whittaker Drive residence. About his identification of the items found at the Whittaker Drive residence, Mr. Landshof explained that some of the furniture he had imported from China and were items "no one else would have had." He further explained that the items that were still boxed had labels addressed to "Robert Landshof." Mr. Landshof stated that the condition in which he found the furniture was such that he could no longer sell it.

Mr. Landshof testified that he saw a truck with a trailer sitting in front of the Whittaker Drive residence. The bed of the pickup truck was filled with empty furniture cartons and packing material. He also observed empty boxes on the trailer. Mr. Landshof identified the list he made while at the Whittaker Drive residence of each of the furniture items recovered at the residence. On the inventory pages, he listed the market value of each of the items before the items were stolen and damaged, with a total value of $76,913 for the items recovered from the Whittaker Drive residence. As to the amount of the furniture found at the Whittaker Drive residence, Mr. Landshof estimated that the items would have fit into a "twenty-six foot bob truck." He said that, at the time, he had

3

only a twenty-foot trailer, so it took multiple trips over the course of five to six hours for Mr. Landshof to load all of the items at the Whittaker Drive residence and return the items to his warehouse. Mr. Landshof stated that he had been unable to sell any of the recovered furniture due to damage.

Mr. Landshof testified that, approximately ten days later, he learned that more furniture had been located in a storage unit, Extra Space Storage, near Elvis Presley Boulevard in Memphis, Tennessee. Mr. Landshof said that it was "instantly obvious" to him that the items in the storage unit belonged to him. He once again made an itemized list of the furniture recovered from multiple storage units and estimated the total value of the items at $89,944. Mr. Landshof explained that he calculated the value of the items in the storage units including the full value of damaged items and the value of items that were missing from boxes that remained in the storage units. The value of the items recovered from the storage units was $76,608 with a total amount of $89,944 for both items recovered and items considered as missing furniture due to the remaining boxes. Mr. Landshof identified photographs of furniture in the storage units, noting that the items were thrown into the units and were broken, dragged, and missing parts. Landshof confirmed that he did not find one piece of furniture in any of the units that did not belong to him.

Mr. Landshof testified that there was a third recovery of his furniture approximately two months later at a flea market building on Brooks Road. He stated that this was a "smaller recovery" with all of the furniture unboxed and set up in a ten by twenty booth. Mr. Landshof stated that, based upon the three recoveries, approximately twenty percent of the total items stolen from the warehouse were found.

On cross-examination, Mr. Landshof testified he did not know either of the defendants. Mr. Landshof confirmed that his alarm system was broken during the time of the break-ins and that he had not installed video surveillance in the warehouse. Mr. Landshof estimated that it would have taken approximately fifty loads with a pickup truck and trailer to remove all of the items that had been stolen from the warehouse.

Mr. Landshof confirmed that he was a sole proprietor and that there was no corporate entity of Fox Lane Furniture. He said that he had operated under the name Fox Lane Furniture and Real Furniture Gallery.

Lakesha Mitchell, Defendant Mitchell's sister, testified that Defendant Norfleet had been her brother's friend since childhood. Ms. Mitchell confirmed that her brother lived at the Whittaker Drive residence in January 2011 with a roommate, "Damien," and a cousin, "Darryl." She estimated that he lived in this residence for approximately three years. She said that Lavell Mitchell, her father, did not live at the Whittaker Drive

4

residence but was "over there." She explained that her father "was like back and forth" between her "aunty['s]" residence and the Whittaker Drive residence. Ms. Mitchell agreed that Defendant Norfleet was also at the Whittaker Drive residence "quite often" when she would stop by the residence.

Ms. Mitchell testified that she frequently went to the Whittaker Drive residence to see her nephew. During these visits she saw an "[u]nusual amount[ ] of furniture." She said there was furniture in the house and in the front yard, but she denied seeing any boxed furniture. Ms. Mitchell recalled that Defendant Mitchell was unemployed at this time but explained that he "cut grass" and hauled away stoves and refrigerators from residences for money. She stated that Defendant Mitchell also bought items such as clothing and shoes to resell. Ms. Mitchell agreed that Defendant Mitchell had also bought furniture for resale.

Ms. Mitchell testified that she recalled giving a statement to the police on January 13, 2011. Ms. Mitchell identified the statement and her signature and initials on the document. Ms. Mitchell agreed that in the statement she was asked if she had observed pieces of furniture at the Whittaker Drive residence still in boxes, and she responded, "yeah." In explaining why she had testified that she did not see any furniture in boxes at the Whittaker Drive residence, she said she did not remember her response to the question during the police interview because it was "too much back." She agreed that, later during the police interview, she again referenced seeing boxed furniture at the Whittaker Drive residence.

On cross-examination, Ms. Mitchell testified that she had never gone with Defendant Mitchell to purchase items wholesale that he intended to later sell and she had never been with Defendant Mitchell when he was selling the items. She stated that she had purchased a shirt from Defendant Mitchell on one occasion and that other family members "sometimes" bought "purses and stuff" from Defendant Mitchell. Ms. Mitchell agreed that she had seen boxed furniture at the Whittaker Drive residence on more than one occasion.

Ms. Mitchell identified a photograph of a trailer that was at the Whittaker Drive residence as the trailer her brother used for his "lawn service."

Tameka Odom, Defendant Mitchell's sister, testified that in January 2011, Defendant Mitchell, "Darryl," Damien Gates, and her father Lavell Mitchell lived at the Whittaker Drive residence. Ms. Odom explained that Lavell Mitchell was her stepfather but the biological father of her sister, Ms. Mitchell, and her brother, Defendant Mitchell. She said that "Darryl" was her cousin and Damien Gates was a friend of the family. Ms. Odom stated that, in January 2011, Defendant Mitchell had been living at the Whittaker

5

Drive residence for "some years." She said that she had often seen Defendant Norfleet, a family friend, at the Whittaker Drive residence during the month of January in 2011. She described the Whittaker Drive residence as a place where "a lot" of people "hung out."

Ms. Odom testified that she was doing laundry at the Whittaker Drive residence on January 13, 2011. She recalled seeing four or five pieces of boxed furniture in the residence, but she did not see any boxes outside of the residence. She denied seeing boxes stacked in the kitchen of the residence. Ms. Odom agreed that she provided the police with a signed statement of what she had observed in the Whittaker Street residence on January 13, 2011. The police statement reflected that Ms. Odom had indicated that she saw "boxes stacked in the kitchen" and "sofas in the backyard." She agreed that the descriptions she provided in the statement were correct even though inconsistent with her trial testimony. She explained that it had been "so long" since this event that she could not recall all the details.

Ms. Odom testified that Defendant Mitchell was unemployed in January 2011 but "help[ed] people move" furniture and offered lawn services for income. Ms. Odom again agreed that if her statement to police indicated that Defendant Mitchell's lawn service had been unsuccessful, then that would be correct. Ms. Odom confirmed that Defendant Mitchell owned a trailer he used to help people move. Ms. Odom agreed that Defendant Mitchell was also engaged in the sale of merchandise. She said that he sold "[w]hatever he c[a]me across." She guessed that he accessed the items for sale by purchasing the items wholesale but that she "ha[d] no idea" where Defendant Mitchell acquired the items he sold.

On cross-examination, Ms. Odom explained that she had started a load of laundry at the Whittaker Street residence while it was dark and then left. At some point she heard there were police officers at the Whittaker Street residence, and she went to the residence with her sister, Ms. Mitchell, and her cousin "Tyrone," to retrieve her clothing. Once there, the police asked her if she would go to the police precinct for questioning, and she agreed. She recalled that she left the police precinct at some time in the morning. Ms. Odom confirmed that she had never asked Defendant Mitchell about why he had all of the furniture at his house. Ms. Odom stated that she believed the police wanted to question her because the police had seen "an enormous amount of furniture," and she went for police questioning "voluntarily."

Sherocka Jones testified that she and Defendant Mitchell had two children together and that, for approximately nine months from the end of 2009 until August 2010, she lived at the Whittaker Drive residence with Defendant Mitchell. Ms. Jones stated that during this time Defendant Mitchell's father, Lavell Mitchell, lived at the residence "off and on." Ms. Jones testified that while she lived at the Whittaker Drive residence,

6

Defendant Mitchell was unemployed but would purchase items and resell them for income. Defendant Mitchell purchased items such as purses and clothing from a flea market on Third Street. Upon occasion, Ms. Jones had accompanied Defendant Mitchell to the flea market and observed him purchasing items for resale. She said that she had never seen him buy any items other than purses and clothing.

Ms. Jones testified that, after moving out of the Whittaker Drive residence, she returned to the residence on occasion to have Defendant Mitchell watch their children while she worked. Ms. Jones stated that she did not go inside the house on these occasions but that Defendant Mitchell met her at her car to take the children inside. Ms. Jones stated that a family member contacted her at work on the evening of January 12, 2011, and advised her that she should go and get her children who were at the Whittaker Drive residence. When Ms. Jones arrived at the residence, she observed police officers and "a lot of trucks." Upon entry into the house, she was questioned and then arrested because her name was still listed on the utility bill. Ms. Jones explained that she had not "transfer[red]" the utilities to another location because she was staying with a friend at the time. Ms. Jones testified that during this incident she did not go beyond the front room of the residence but that she observed that there was "more furniture than was necessary to furnish the house."

Deven Shives[2] testified that he was arrested and charged in this case along with Defendant Mitchell and Defendant Norfleet. Mr. Shives explained that he was not arrested at the Whittaker Drive residence at the time of the execution of the search warrant but that he was driving in the "Whitehaven area" when he was pulled over and arrested. Mr. Shives stated that he owned a "bob truck" that he bought to transport furniture purchased at auctions. After buying the truck in 2009, he also used it to help move people. Mr. Shives recalled that he rented his truck to Lavell Mitchell, Defendant Mitchell's father, in January 2011. Lavell Mitchell told Mr. Shives that he needed to rent the truck for one day to help his girlfriend with a move. When Lavell Mitchell did not return the truck after twenty-four hours, Mr. Shives drove to Defendant Mitchell's residence where he observed the truck sitting out front.

Mr. Shives testified that Lavell Mitchell met him outside and explained that there was still some furniture in the back of the truck. When Lavell Mitchell "raised the back of the truck up," Mr. Shives observed "a couple of boxes of furniture. . . . like maybe two nightstands and two dressers." Mr. Shives agreed to allow Lavell Mitchell to transport the items to storage and then return the truck. The two men drove to a nearby storage facility and arranged for a storage unit. Mr. Shives asked Lavell Mitchell for the $80 he

_____

[2] The indictment spells Mr. Shives first name as "Devene;" however, at trial Mr. Shives spelled his name "Deven." As such, we use the spelling as testified to by Mr. Shives.

owed for the rental of the truck, and Lavell Mitchell said he did not have the money. In lieu of a cash payment, Lavell Mitchell gave Mr. Shives one of the nightstands and one of the dressers and "told [him] to just give [Lavell Mitchell] another hundred dollars for it." Mr. Shives said that he never made the payment because he was thereafter arrested for theft.

Mr. Shives testified that he put the furniture Lavell Mitchell had sold him in his storage unit where he also had stored some empty furniture boxes. Mr. Shives confirmed that this was the only occasion on which he rented his truck to Lavell Mitchell.

On cross-examination by Defendant Mitchell's attorney, Mr. Shives testified that Defendant Mitchell had never borrowed or used his truck. Further, he stated that he had never observed Defendant Mitchell "handle[ ] furniture" or observed Defendant Mitchell at the storage unit. Mr. Shives stated that, at the time of his arrest, he had a "stand" in the back of his truck that he had purchased from a man at the Dodge Chicken Store located on Elvis Presley Boulevard in Memphis, Tennessee. He explained that the unknown man approached him saying that "he had some furniture." Mr. Shives said that, given the circumstances of the purchase, he did not consider whether the furniture was stolen because he "can't judge anybody." Along with the "stand," Mr. Shives also bought two dressers, two nightstands, and "some unique" bar stools for $600.00. Mr. Shives reiterated that he had never seen Defendant Mitchell with furniture.

On cross-examination by Defendant Norfleet's attorney, Mr. Shives stated that he was arrested because there was a question about the ownership of the furniture found in the back of his truck. Mr. Shives agreed that he had told police that he was helping someone move that day. This arrest occurred several weeks after he had retrieved his truck from Lavell Mitchell. Mr. Shives stated that he was unaware of the search warrant executed on the Whittaker Drive residence until he saw the defendants in court on these charges.

Phillip Collins testified about an interaction that occurred between the defendants in January 2011. He said he, along with others, were at the Whittaker Drive residence; however, the conversation discussing furniture occurred between only the defendants, Ronnie Evans, and Mr. Collins. Mr. Collins said that he asked Defendant Mitchell why there was furniture in the yard and why he did not put the furniture in storage to prevent the rain from damaging the furniture. He said the men discussed Extra Space Storage, located near the Whittaker Drive residence, where Shannon Taylor, Tonio Greer, and the defendants already rented storage units. Mr. Collins recalled that during the conversation he learned that the men wanted to "get rid of" the furniture, but no one explained why.

8

Mr. Collins testified that he provided police with a statement on January 20, 2011. After reviewing his statement to police, he remembered that he had stated to the police that the men wanted to get rid of the furniture "before somebody told." Mr. Collins said the concern was that someone might tell the police that the furniture was stolen he "guess[ed]." Mr. Collins stated that, during this conversation at the Whittaker Drive residence, the men discussed the fact that Defendant Mitchell and Defendant Norfleet had taken the furniture and that the defendants, Shannon Taylor, Ronnie Evans, and Lavell Mitchell were all involved in the "burglary."

Mr. Collins testified that he stole a few of the items in the yard at the Whittaker Drive residence from Defendant Mitchell. While he never discussed his taking items from the yard with Defendant Mitchell, he believed that Defendant Mitchell suspected that this had occurred. About how the furniture was moved from the Whittaker Drive residence to the storage unit, Mr. Collins stated that the defendants used a truck and trailer to transport the items at night. He said that he observed the defendants doing so on more than one occasion.

On cross-examination by Defendant Mitchell's attorney, Mr. Collins agreed that he failed to mention that Lavell Mitchell was also present during the conversation at the Whittaker Drive residence. As to his own involvement in this conversation, Mr. Collins agreed that he was a short distance from the men while they discussed the "burglary" but not part of the conversation. Mr. Collins stated that he suggested Extra Space Storage to Defendant Mitchell because Mr. Collins had rented a unit there when he had moved the previous November.

Mr. Collins testified that, after learning of the burglary but before "the arrests," he called Crime Stoppers and received a reward based upon the information he provided. Mr. Collins said that he did not tell the police officer interviewing him on January 20, 2011, that he had provided information about the furniture via an anonymous call to Crime Stoppers. Mr. Collins agreed that he had previously pleaded guilty to two counts of felony theft of property and one count of aggravated burglary in March 2002 and to one count of aggravated burglary in March 2009.

Henry Schoefield testified that he provided a statement to police on January 12, 2011, about the stolen furniture. Mr. Schoefield explained that Defendant Norfleet had approached him about buying furniture approximately one week before the police questioned him. Mr. Schoefield talked with Defendant Norfleet at the Dodge's Gas Station located near the Whittaker Drive residence. The two men exchanged phone numbers, and Defendant Norfleet called Mr. Schoefield about the furniture the following day. During the phone conversation, Defendant Norfleet told Mr. Schoefield that he had

a "deal for [Mr. Schoefield]" and instructed Mr. Schoefield to meet him at the Whittaker Drive residence.

Mr. Schoefield testified that when he arrived at the Whittaker Drive residence, approximately forty minutes after his phone conversation with Defendant Norfleet, both defendants were present. Defendant Norfleet showed Mr. Schoefield a "coffee end table set, dinette set" that was still boxed in the back yard. About buying the furniture, Mr. Schoefield told Defendant Norfleet that "if [he] get the money" then he would "get up with [Defendant Norfleet] later." Mr. Schoefield confirmed that he had never told Defendant Norfleet that he needed furniture or that he was looking to purchase furniture.

Mr. Schoefield testified that while at the Whittaker Drive residence he observed other boxes of furniture, but "a lot of the stuff was covered up . . . [with] blue plastic." Mr. Schoefield said that the bulk of the boxed furniture was outside but that there were four or five boxes inside the residence as well as unboxed items such as mirrors and decorative pieces. Mr. Schoefield also described a "mahogany wood marble top" table he observed in the house. He stated that he was interested in buying the table but that "the other two ends" were missing.

On cross-examination by Defendant Mitchell's attorney, Mr. Schoefield confirmed that he saw Defendant Mitchell at the Whittaker Drive residence, but he said that the two did not discuss the furniture. Defendant Mitchell nodded at Mr. Schoefield but "[k]ept going about his business." Mr. Schoefield confirmed that Lavell Mitchell was not present at the residence when he was looking at the furniture. When confronted with his police statement indicating that Lavell Mitchell was at the house, Mr. Schoefield explained that, during his telephone conversation with Defendant Norfleet, Defendant Norfleet indicated that Lavell Mitchell would be with him at the Whittaker Drive residence. When he arrived, however, he did not see Lavell Mitchell at the residence. He told the police Lavell Mitchell was present based upon Defendant Norfleet's statement during their phone conversation. Mr. Schoefield agreed that he did not know from where the furniture boxes came.

Mr. Schoefield testified that the police questioned him about the stolen furniture because Defendant Norfleet told the police that Mr. Schoefield bought some of the stolen furniture. Mr. Schoefield denied having bought any furniture from Defendant Norfleet. Mr. Schoefield agreed that he had been to the Whittaker Drive residence on a previous occasion when the boxed furniture had not been there. Mr. Schoefield acknowledged that he and Defendant Norfleet had a disagreement over money in May 2010. Mr. Schoefield stated that their dispute had been resolved long before he went to the Whittaker Street residence to look at the furniture.

10

On cross-examination by Defendant Norfleet's attorney, Mr. Schoefield confirmed that he did not go to the Whittaker Drive residence on the same day that he spoke with Defendant Norfleet at Dodge's Gas Station. After reviewing his January 12, 2011 statement, which indicated that he walked to the house with Defendant Norfleet after meeting him at Dodge's Gas Station, Mr. Schoefield explained that he began to walk to the Whittaker Drive residence with Defendant Norfleet, but, upon remembering he had agreed to give someone a ride, he returned to the gas station.

Shun Taylor, an Extra Space Storage manager, testified that he maintained the store records of rentals. He explained the Falcon system used at the facility to track entry and exit of the facility and storage rentals. Mr. Taylor identified the report generated for persons entering and leaving the storage facility on January 6, 17, and 19, 2011. Mr. Taylor testified that, according to the report, Seandolyn Shives, Mr. Shives's sister, rented unit E22, and her code was used to enter the property on January 9, 2011 at 5:23 p.m. and exit the property at 5:36 p.m. On January 19, 2011, Ms. Shives's code was used to enter the property at 5:23 p.m. and exit at 5:28 p.m. The report showed Lavell Mitchell as the tenant of unit number E20 and Ronald Evans as the tenant of unit number F13.

Cynthia Jones, a Memphis Police Department investigator, testified that her involvement in this case began with a telephone call from Mr. Schoefield. Sergeant Jones recalled that, during the telephone conversation, Mr. Schoefield disclosed that someone had approached him about buying furniture while he was at Dodge's Gas Station. After asking Mr. Schoefield a few questions about the location of the furniture, she asked him to come to the precinct and give a statement. Mr. Schoefield provided a statement at the precinct, and, after the information was verified, police officers executed a search warrant on the Whittaker Drive residence.

Sergeant Jones testified that, upon execution of the warrant, she observed a lot of furniture, both inside and outside of the Whittaker Drive residence. She identified the inventory list made at the scene of the numerous items recovered. Sergeant Jones confirmed that some of the furniture was boxed while other pieces were not. Because most of the boxed items had Fox Lane Furniture store labels, the police contacted Mr. Landshof for confirmation that it belonged to him. Mr. Landshof came to the scene and identified the furniture as items stolen from his furniture warehouse. Some of the items were taken to the police property room, and the remainder Mr. Landshof and an employee loaded and transported to another location.

Sergeant Jones testified that the police took Defendant Mitchell, Lavell Mitchell, Damon Gates, Sharocka Jones, and Defendant Mitchell's two sisters into custody that

11

night. After speaking with Defendant Mitchell's sisters, the two women were released from custody. Several days later, on January 19, 2011, police officers stopped a "white type bob truck." During the stop, the police officers learned that the tag was stolen. Sergeant Jones was later contacted about the stop due to furniture found in the back of the truck that was consistent with descriptions of the furniture taken from Mr. Landshof's furniture warehouse. Sergeant Jones said that the truck was towed and two individuals, Mr. Shives and Terrence Banks, were taken into custody that night.

Sergeant Jones testified that, the following day, January 20, 2011, she received a phone call from Phillip Collins. Mr. Collins told the sergeant that he was tired of being "the fall guy" and had heard he was being blamed for the furniture thefts. Mr. Collins provided a statement at the precinct indicating that more furniture was being stored at the Extra Space Storage facility located near the Whittaker Drive residence. Mr. Collins further provided actual storage unit numbers where the furniture was stored. Police officers obtained search warrants for these units. Upon execution of search warrants police officers recovered furniture from storage unit E22, but all of the furniture had been removed from E20 and all that remained were the Fox Lane Furniture boxes. Based upon a statement made by the manager on duty and observations made at the storage facility, officers sought and obtained another search warrant for unit number D10. The police officers found additional furniture in that unit.

Sergeant Jones testified that, at this point in the investigation, the police formally charged Mr. Shives, Defendant Mitchell, Lavell Mitchell, Defendant Norfleet, and Ronald Evans with theft of property. Sergeant Jones interviewed Defendant Mitchell who stated that he had met a man named "Chris" at the Church's Chicken located on Elvis Presley Boulevard approximately a month or a month and a half before. He said the two men decided to do business together, and Defendant Mitchell purchased all of the furniture recovered at the Whittaker Drive residence for $1500 from "Chris." Defendant Mitchell could not provide any additional information about "Chris" other than his first name. Defendant Mitchell stated that he purchased furniture from "Chris" on three or four occasions.

On cross-examination by Defendant Mitchell's attorney, Sergeant Jones denied that Defendant Mitchell ever told her that he bought items wholesale to resell. When asked "[w]hat was the beef" between Mr. Schoefield and Defendant Norfleet, Sergeant Jones stated, "I wasn't aware that there was a beef." Upon further questioning, she said that Mr. Schoefield indicated to her that he did not want to be identified because of Defendant Mitchell's gang affiliation. Sergeant Jones agreed that there were "a number" of televisions in the house that Mr. Landshof did not identify as part of his missing inventory. About Mr. Collins's phone call to police about the storage unit, Sergeant

Jones recalled that Mr. Collins stated that he too had rented a storage unit, but Sergeant Jones never searched the unit Mr. Collins referenced.

On cross-examination by Defendant Norfleet's attorney, Sergeant Jones testified that she was able to contact Mr. Landshof through information he had provided on the police reports he had filed related to the break-ins of his warehouse. At the time of Mr. Schoefield's phone call, Sergeant Jones was unaware of any burglaries involving furniture. She, however, spoke with two different supervisors, and one of them indicated that there were several reports of burglaries involving a furniture store made at the Raines Station police precinct. Sergeant Jones agreed that there were also items stolen from Fox Lane Furniture that were recovered at a flea market booth. Based on the investigation, it appeared that the flea market booth had been rented to Mr. Shives.

Sergeant Jones testified concerning Mr. Schoefield's statement at the police precinct about going to see the furniture. She said that Mr. Schoefield told her that Defendant Norfleet approached him at Dodge's Gas Station about furniture, and the two men walked to the Whittaker Drive residence. She said that Mr. Schoefield made no mention of exchanging phone numbers and going to the Whittaker Drive residence the following day. Sergeant Jones recalled that Defendant Mitchell, Lavell Mitchell, David Gates, Darrell Evans, Lakesha Mitchell, Tameka Odom, and Sherocka Jones were all present during the execution of the search warrant. After speaking with all of these witnesses, Sergeant Jones requested on January 14, 2011, that Defendant Norfleet, Phillip Collins, and Ronald Evans be located. Sergeant Jones confirmed that she learned from an Extra Space Storage manager that Seandolyn Shives never used her storage unit, E22, after she rented it but that her brother Mr. Shives used the unit. Sergeant Jones agreed that, on the day of Mr. Shives's arrest, the entry report from the storage unit showed that there were multiple entries to the property for unit E22. Sergeant Jones confirmed that E22 was the unit that had only boxes remaining when the search warrant was executed.

Defendant Mitchell testified that in 2011 he lived in a residence located on Whitaker Drive with Damon Gates and Darrell Evans. He stated that he had moved into the residence in 2009. Defendant Mitchell explained that Damon Gates was his cousin and Darrell Evans was his friend. Defendant Mitchell stated that the utilities for the residence were in the name of Sharocka Jones, the mother of two of his six children. Defendant Mitchell stated that at the time of these events he supported himself by mowing yards, selling scrap metal, selling purses and shoes, and renting his trailer. Defendant Mitchell explained that he purchased items to resell at a flea market or auction. He said that he has been buying and reselling items as a source of income for ten years.

Defendant Mitchell testified that, in November 2010, he met a man at Church's Chicken on Elvis Presley Boulevard in Memphis, Tennessee. The man pulled Defendant Mitchell aside and asked if he was interested in buying any furniture. Defendant Mitchell responded, "I'll see, you know, I'll check back with you later on." Defendant Mitchell took the man's phone number and later met the man at a flea market in Westwood. Defendant Mitchell paid $750 for "a couple of" highboys, a dresser, a nightstand, a couch, and a "couple of beds," purchased from the man's U-Haul truck. Several weeks later Defendant Mitchell called the man and arranged to buy more furniture. Defendant Mitchell explained that he was "remodeling and refurnishing" his home at the time because he had "just kind of moved."

Defendant Mitchell testified that he had never stored items at the Extra Space Storage facility nor had he ever asked someone to rent a unit for his use. He acknowledged that his father, Lavell Mitchell, had a unit at the Extra Space Storage facility but denied ever having been to the unit or knowing what items his father stored there. Defendant Mitchell recalled that his father borrowed his truck and trailer on one occasion to help his girlfriend move. Defendant Mitchell denied having "a problem" with Mr. Schoefield but explained that Mr. Schoefield and Defendant Norfleet had an issue and that Mr. Schoefield knew the defendants to be friends.

Defendant Mitchell testified that Mr. Schoefield had been to the Whittaker Drive residence during the summer of 2010 but not since then. He denied any knowledge of Mr. Schoefield being with Defendant Norfleet at the residence to look at furniture. Defendant Mitchell denied any gang affiliation. Defendant Mitchell explained that there were flattened boxes that he had placed in his trailer outside the house from the furniture he had purchased for his home. Defendant Mitchell denied that there was a blue tarp covering boxes in his yard and denied that there was a great deal of furniture in his house. Defendant Mitchell described the furniture as in good shape. When asked by his attorney, "Now, [your house] has been described as overstuffed, your house was overstuffed, there's more furniture than you would need but you have been buying and selling, hadn't you?" Defendant Mitchell responded that he had sold a couple of nightstands and a bed to a friend. He said that the friend was over around Christmas to play cards and commented that she liked the furniture pieces and so Defendant Mitchell sold the items to her. Defendant denied any knowledge that the items were owned by Mr. Landshof.

Defendant Mitchell testified that he did not believe he was getting a "too good to be true deal" when he bought the furniture. He explained that he was not knowledgeable about furniture and mostly dealt with clothing, shoes, and purses. Defendant Mitchell stated that he paid the man $750.00 the first trip and $850.00 for the items he purchased during his second trip to meet with the man. When asked if he thought that the items

could have been stolen, Defendant Mitchell responded, "not necessarily." Defendant Mitchell stated that his father, Lavell Mitchell, did not live with him at the time but "visit[ed] a lot." He denied ever having a conversation with Lavell Mitchell or anyone else about a burglary. He denied using his trailer to transport stolen furniture or loaning his trailer for such use.

On cross-examination, Defendant Mitchell agreed that he bought two highboys, a dresser, two nightstands, two beds, and a couch the first time he met with the man selling furniture from his U-Haul. During the second trip, he purchased a sectional couch, two more beds, "more" nightstands, a mirror, a patio set, and two armoires for $850. He added that he also purchased a drummer boy and "another kind of Christmas thing" that he was not sure "what it was." He also added that he purchased a cherry table with a marble top. Defendant Mitchell agreed that he had negotiated the price both times and thought they were fair prices. Defendant Mitchell described "Chris," the man he had purchased the furniture from as six foot one or two inches tall, and brown-skinned, with a "low haircut." Defendant Mitchell stated that he met "Chris" mid-November 2010. When asked the name of the friend he sold some of the furniture to he said, "[a] girl named Teresa" and could not provide a last name. Defendant Mitchell denied that any one else had sold furniture from his house, stating that there was not any furniture at his residence to be sold. Defendant Mitchell reviewed all the photographs taken at his residence on the night of the search warrant and stated that he recognized all the pictures as photographs of his home on the night of January 12, 2011.

On redirect examination, Defendant Mitchell stated that there were items, such as wrought iron doors, clothing, MLGW meters, and pictures that were already in the house at the time he moved in.

After hearing the evidence, the jury convicted Defendant Mitchell and Defendant Norfleet of theft of property valued at more than $60,000. At a subsequent hearing, the trial court sentenced Defendant Mitchell to eight years, suspended to ten years of probation after service of ten months and twelve days. The trial court sentenced Defendant Norfleet to serve thirty years of incarceration as a career offender. It is from these judgments that the defendants now appeal.

## II. Analysis

On appeal, Defendant Norfleet asserts that: (1) the State made improper argument to the jury; (2) there is a variance between the indictment and the evidence presented at trial; (3) the trial court failed to properly instruct the jury on the lesser-included offense of attempted theft; and (4) the trial court improperly sentenced Defendant Norfleet as a career offender because the State failed to comply with the mandatory ten-day notice

requirement for seeking punishment in an enhanced range. Defendant Mitchell also challenges the prosecutor's statements during closing argument as improper but additionally asserts that: (1) the evidence is insufficient to sustain his conviction; (2) the trial court improperly admitted testimony from a witness that gave inference to his gang affiliation; (3) the trial court improperly ordered restitution; and (3) the cumulative effect of these errors deprived him of a fair trial. We will initially address the defendants' claim regarding prosecutorial misconduct and then take each defendant's separate set of issues in turn.

## A. Prosecutorial Misconduct

Both defendants argue that the trial court erred when it denied their request for a mistrial based upon the State referencing facts outside the record during closing argument. The defendants contend that the State's comment prejudiced the jury and was made to prove intent. The State responds that the trial court properly denied a mistrial and gave an appropriate curative instruction to the jury. We agree with the State.

During closing argument, the State's prosecutor referenced Ms. Odom's testimony affirming that her police statement was accurate and then referenced the statement wherein Ms. Odom stated that Defendant Mitchell bought stolen merchandise. Both defense attorneys objected and requested a mistrial, noting that Ms. Odom never testified that Defendant Mitchell bought stolen goods. The trial court agreed that Ms. Odom never testified that Defendant Mitchell bought stolen merchandise and asked the prosecutor the basis for the statement. The prosecutor responded, "I thought I went through her entire statement with her, judge." The trial court stated that testimony regarding that portion of Ms. Odom's statement had been excluded as a "404(b) issue." In discussing options on how best to proceed, Defendant Norfleet's attorney offered that "a curative instruction would help." The trial court agreed and instructed the jury as follows:

> Ladies and gentlemen, I'm going to give you what's called a curative instruction, that's a legal term. I don't think, I know there was a witness who testified about how he buys things and resells it, I don't think that this witness testified that he bought stolen things and resold them. That just, that word was never mentioned. And so if [the prosecutor] was trying to get you to think that anybody has a propensity or does something like that for a living, that's just not in the proof. So if you'll just disregard that and [the prosecutor] will continue.

> But disregard any proof about any other person having knowledge. A person would never even have knowledge that if he sold something it was stolen because how would they know, so. So I'm going to ask you just

16

to disregard that, that part of that statement. Just as I told you in my, in my charge, if there's not anything in the proof, you should disregard.

The prosecutor then stated:

> Your Honor, I apologize. That's my mistake for misstating that. That is not what she said. He buys, as the judge said, he buys merchandise and sells it.
>
> . . . .
>
> My mistake. As the judge pointed out and is correct. We were talking about Tameka Odom, now she said he buys things and sells things.

Both defendants raised this issue their motions for new trial. At the hearing on Defendant Norfleet's motion, the prosecutor referenced his statement about Ms. Odom's police statement as "error on my part" but argued that the error was corrected by the trial court's instruction to the jury that the prosecutor's statement was "not proof before them and they were not to consider it." As to this issue, the trial court made the following findings:

> As far as the comment about buying and stealing stolen goods, I gave an immediate curative instruction to the jury and it was kind of a non-event. I don't find that it affected the verdict at all. And that the curative instruction was sufficient on that.

At the hearing on Defendant Mitchell's motion, Defendant Mitchell's attorney characterized the statement in closing argument as "maybe" "a momentary lapse of reason," and the prosecutor agreed that that was a "fair [ ] characterization" of what had occurred. The prosecutor explained "Essentially, I was going from a statement which I used to guide my direct examination of [Ms. Odom] when I was going through closing and my eye caught that and I did say that out loud." The prosecutor then noted that both the trial court and he informed the jury that the statement was "a mistake." The trial court made the following findings as the issue related to Defendant Mitchell:

> [W]ell, first I'm going to make a finding that it was not done intentionally or maliciously as far as prosecutorial misconduct. It was inadvertent. And I think what we did sufficiently covered it. Looking at the, in my opinion, overwhelming proof of [Defendant Mitchell's] guilt, I don't see that it made any difference at all. . . . I just found the proof against [Defendant Mitchell] to be overwhelming as far as his controlling this property.

17

Our Supreme Court, in *State v. Jackson*, 444 S.W.3d 554, 590 (Tenn. 2014), addressed standards for review of errors in the context of improper prosecutorial argument and the importance of identifying the category of error to determine the standard. Our review must begin with identifying the category of error: (1) structural constitutional error; (2) non-structural constitutional error; or (3) non-constitutional error. The category of error will then guide our review of the error. Structural constitutional error requires automatic reversal. *Id.* Non-structural constitutional errors and non-constitutional errors, however, do not require mandatory reversal. *Id.* For non-structural constitutional error, the State bears the burden of demonstrating that the error is harmless beyond a reasonable doubt. *Id.* at 591 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). Non-constitutional errors require the defendant to establish "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Id.* (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). In our view, the error alleged in this case is a non-constitutional error.

In general, the scope of opening and closing arguments is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Argument, however, must be temperate, "predicated on evidence introduced during the trial," and relevant to the issues being tried. *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994). Thus, the State must not engage in argument designed to inflame the jurors and should restrict its comments to matters properly in evidence at trial. *State v. Hall*, 976 S.W.2d 121, 158 (Tenn. 1998).

In *State v. Goltz*, this Court set out the following five recognized areas of prosecutorial misconduct related to argument of counsel:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

18

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

When a reviewing court finds improper prosecutorial argument that does not rise to the level of a constitutional violation, five factors should be considered to determine whether a prosecutor's improper conduct could have affected the verdict to the "prejudice of the defendant." *State v. Philpott*, 882 S.W.2d 394, 408 (Tenn. Crim. App. 1994). The factors are: (1) the conduct complained of in light of the facts and circumstances of the case; (2) the curative measures undertaken; (3) the intent of the prosecutor in making the improper remarks; (4) the cumulative effect of the improper conduct and any other errors in the record; and, (5) the relative strength or weakness of the case. *Id.* (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5.

In considering the five recognized areas of prosecutorial misconduct set forth in *Goltz*, we conclude that the prosecutor's comment in this case, although a misstatement of the facts in evidence, was not intentional. The prosecutor explained how the error occurred and admitted his mistake both to the trial judge and the jury. At the motion for new trial hearings, the prosecutor referenced the statement repeatedly as an "error," and the trial court found that the prosecutor's statement was not intentional or malicious.

Furthermore, in considering "whether the improper conduct could have affected the verdict to the prejudice of the defendant," we cannot conclude that the comment affected the jury. *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). The reference to Defendant Mitchell buying stolen merchandise to sell was isolated in the context of the entire closing argument, and the State's case against the Defendant was overwhelming. The prosecutor's statement was an error predicated on his belief that he had reviewed Ms. Odom's entire statement with her, and he apologized and admitted his error to both the trial court and the jury. The trial court immediately issued a curative instruction, and the jury is presumed to have followed the trial court's instruction. *See State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). Accordingly, we conclude that the improper conduct

19

complained of did not affect the jury's verdict to the prejudice of the Defendant. The Defendant is not entitled to relief as to this issue.

## B. Defendant Norfleet's Remaining Issues on Appeal
### 1. Indictment

Defendant Norfleet asserts that he was not "sufficiently informed" of the charges against him because the indictment named "Fox Lane Furniture" as the victim rather than Robert Landshof. The State responds that the naming of Fox Lane Furniture rather than Robert Landshof as the victim is not a fatal variance. We agree with the State.

The indictment in this case states that Defendant Mitchell:

> did unlawfully and knowingly obtain or exercise control over certain property, to wit: merchandise, of the value of $60,000 or more, the property of FOX LANE FURNITURE, without the effective consent of FOX LANE FURNITURE, with intent to deprive FOX LANE FURNITURE of the said property, in violation of T.C.A. 39-14-103, against the peace and dignity of the State of Tennessee.

We have stated that the purpose of an indictment is threefold: "'First, it must inform the defendant of the precise charges. Second, it must enable the trial court upon conviction to enter an appropriate judgment and sentence; and, last, it must protect defendant against double jeopardy.'" *State v. Clark*, 2 S.W.3d 233, 235 (Tenn. Crim. App. 1998) (citing *State v. Trusty*, 919 S.W.2d 305, 309 (Tenn. 1996)).

"A variance between an indictment . . . and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). A variance is not material when substantial correspondence exists between the proof and the indictment. *Shropshire*, 45 S.W.3d at 71. When the indictment and the proof substantially correspond, a defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material. *Moss*, 662 S.W.2d at 592. It is not reversible error when a defendant is sufficiently aware of the charge and is able to adequately prepare for trial. *Id*.

Upon reviewing the language in the indictment and the transcript of the proceedings, we find that the indictment served the three aforementioned purposes. The indictment informed Defendant Norfleet of the charges, enabled the trial court to enter an

20

appropriate judgment and sentence, and protected Defendant Norfleet against double jeopardy.

The proof at trial showed that Defendant Norfleet exercised control over furniture stolen from a warehouse owned by Robert Landshof who did business as Fox Lane Furniture. Mr. Landshof testified that Fox Lane Furniture was "not a separate corporate entity." Mr. Landshof owned the inventory, filed taxes as an individual owner of a business, and sold the inventory either in his Fox Lane Furniture showroom or through internet orders. Accordingly, we conclude that the indictment naming Fox Lane Furniture as the owner of the merchandise does not constitute a material or prejudicial variance. Defendant Norfleet is not entitled to relief as to this issue.

### 2. Jury Instruction

Defendant Norfleet asserts that the trial court erred when it declined to instruct the jury on the lesser-included offense of attempted theft. Defendant Norfleet argues that he was entitled to this charge because he never actually sold any furniture but merely solicited a buyer for the furniture. The State responds that Defendant Norfleet has waived this issue for failing to file a written request for the instruction of lesser-included offenses and, alternatively, the trial court properly declined to issue the instruction.

In Tennessee, "[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal." T.C.A. 40-18-110(c); *See also State v. Page*, 184 S.W.3d 223, 229-30 (Tenn. 2006). This Court may, however, review an issue which would ordinarily be considered waived if the court finds plain error in the record. *See* Tenn. R. Crim. P. 52(b). The party claiming plain error has the burden of persuading the appellate court. *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008).

The State correctly points out that the Defendant waived his right to dispute the trial court's failure to instruct on the lesser-included offense by not filing a request or objecting to the instructions. *See* T.C.A. 40-18-110(c). Thus, this Court need not grant relief unless the failure to instruct constituted plain error, or in the alternative, this Court, in the exercise of its discretion, opts to consider the merits of the issue. *See State v. Adkisson*, 899 S.W.2d 626, 636 (Tenn. Crim. App. 1994). Having so concluded, we must now address whether the instructional error was plain error.

The Tennessee Rules of Criminal Procedure explain that "plain error [,] . . . [a]n error which has affected the substantial rights of an accused [,] may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn.

21

R. Crim. P. 52(b). We have said that "[w]hether or not an appellate court should recognize the error and grant relief . . . depend[s] upon the facts and circumstances of the particular case." *State v. Ogle*, 666 S.W.2d 58, 61 (Tenn. 1984).

In *State v. Smith*, 24 S.W.3d 274 (Tenn. 2000), our Supreme Court discussed the recognition of plain error by appellate courts. In *Smith*, the Court adopted the test established in *Adkisson*, 899 S.W.2d at 641-42, to determine whether a trial error rises to the level of "plain error." *Smith*, 24 S.W.3d at 282-83. *Adkisson* held that the following five factors must be present for a finding of plain error:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

899 S.W.2d at 641-42 (footnotes omitted). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Smith*, 24 S.W.3d at 283.

In the case under submission, it is clear that all five factors have not been established. The Defendant has failed to show that a substantial right has been adversely affected. "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). This "includes the right to jury instructions on each and every lesser-included offense embraced within the charged offense(s) and supported by the proof." *State v. Davis*, 266 S.W.3d 896, 902 (Tenn. 2008).

In *State v. Burns*, 6 S.W.3d 453, 466-69 (Tenn. 1999), the Supreme Court set out a framework for determining whether an offense should be included as a lesser-included offense in a particular case. First, the Court provided a test for courts to determine whether an offense, in general, qualifies as a lesser-included offense of the charged offense. Under this test, "[i]f a lesser offense is not included in the offense charged, then an instruction should not be given, regardless of whether evidence supports it." *Id.* at 467. If the offense qualifies as a lesser-included offense according to the inquiry above, the trial court still must determine whether the evidence in the particular case merits a jury instruction for that lesser-included offense. *Id.*

22

The first prong articulated in *Burns* was codified in large part in 2009 by our legislature as follows:

> An offense is a lesser included offense if:
>
> (1) All of its statutory elements are included within the statutory elements of the offense charged;
>
> (2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);
>
> (3) The offense is attempt to commit the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or
>
> (4) The offense is solicitation to commit the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

T.C.A. § 40-18-110(f).

Applying the first prong of the analysis to the present case, we note that the statute specifically provides for attempt of the charged offense as a lesser-included offense of the charged offense. *See id*. § 40-18-110(f)(3). Thus, the lesser-included offense in this case satisfies the first prong of our analysis, and we can turn to the second prong.

With respect to the second prong, the legislature adopted a provision similar to the one articulated in *Burns* for determining whether the evidence in the particular case merits a jury instruction for that lesser-included offense:

> When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of such

23

evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

T.C.A. § 40-18-110(a).

The testimony at trial supported only two interpretations – that the theft occurred or it did not. The State's evidence showed that an enormous amount of boxed furniture was stored at Defendant Mitchell's residence, some of which had shipping labels addressed to Robert Landshof, the victim. The evidence further showed that Defendant Norfleet tried to sell the items without Mr. Landshof's consent and transported the items to a Storage facility to avoid detection of the stolen items. The fact that he was unsuccessful in his attempt to sell furniture to Mr. Schoefield after the items had been stolen does not alleviate his culpability in exercising control over Mr. Landshof's furniture without his consent. Therefore, the trial court did not commit "plain error" when it failed to instruct the jury on attempt to commit theft. The Defendant is not entitled to relief as to this issue.

### 3. Career Offender Status

Defendant Norfleet asserts that "the trial court erred by sentencing [him] as a Career Offender where the State failed to comply with the clear statutory notice requirement." Defendant Norfleet's brief then recites the law on the State's duty in seeking enhanced sentencing. The brief, however, makes no argument as to the Defendant's claim, showing of prejudice, or even reference to this case and the facts therein. From the State's brief, we ascertain that Defendant Norfleet's issue as it relates to the facts of this case is that the State filed the notice seven-days prior to trial rather than the statutory ten days.

With respect to the State's duty to provide a notice to seek enhanced punishment, Tennessee Code Annotated section 40-35-202(a) states as follows:

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that the notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement ... must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions. The original or certified copy of the court record of any prior felony

conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named therein is the same as the defendant before the court, and is prima facie evidence of the facts set out therein.

The purpose of the statutory notice requirement is to provide a defendant with fair notice that he or she is subject to greater than the standard sentencing range, to facilitate plea agreements, to enable the defendant to make an informed plea, and to aid trial strategy. *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990); *State v. Taylor*, 63 S.W.3d 400, 412 (Tenn. Crim. App. 2001). Our Supreme Court has held that "perfect" notice is not required, but fair notice must be provided. *State v. Livingston*, 197 S.W.3d 710, 713 (Tenn. 2006). This means that "when the State has substantially complied with Section 40-35-202(a), an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." *Taylor*, 63 S.W.3d at 412; *see also State v. Cooper*, 321 S.W.3d 501, 507 (Tenn. 2010); *State v. Richard Douglas Lowery*, No. 03C01-9604-CC-00146, 1997 WL 260070, at *5 (Tenn. Crim. App., at Knoxville, at May 19, 1997), *perm. app. denied*, (Tenn. Mar. 16, 1998).

As the State correctly notes, Defendant Norfleet did not object to the late-filing of the notice nor did he move for a continuance based upon the untimely notice. *See State v. Livingston*, 197 S.W.3d 710, 712 (Tenn. 2006) (holding that "in the absence of a defense motion for a continuance, any objection to the late-filed notice was waived.") Furthermore, Defendant Norfleet does not allege any prejudice from the notice filed seven days before trial. As such, Defendant Norfleet is not entitled to relief as to this issue.

## C. Defendant Mitchell's Remaining Issues
### 1. Sufficiency of the Evidence

Defendant Mitchell asserts that the evidence is insufficient to support his conviction for theft of property valued over $60,000 because the State failed to establish that he knew the furniture at his house and the storage facility was stolen. He further contends that the State failed to establish the value of the stolen property. The State responds that sufficient evidence was presented for a rational trier of fact to find beyond a reasonable doubt that Defendant Mitchell is guilty of the offense as charged.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R.

App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" S*tate v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute on other grounds as stated in State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at

26

775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2014). Theft of property valued over $60,000.00 but less than $250,000.00 is a Class B felony. T.C.A. § 39-14-105(5) (2014).

The evidence, viewed in the light most favorable to the State, showed that the warehouse owned and operated by Robert Landshof doing business as Fox Lane Furniture was broken into and numerous items were stolen between September 2010 and January 2011. In January 2011, Mr. Schoefield contacted Sergeant Jones and disclosed that Defendant Norfleet was selling stolen furniture located at Defendant Mitchell's residence. Pursuant to a search warrant, police officers found furniture stacked up in boxes inside the kitchen and stored in every room, including the garage of the residence. Police officers also found new furniture outside the residence sitting in the snow. Many of the boxes named Robert Landshof as the intended recipient on the exterior. Mr. Landshof identified the furniture as the furniture stolen from his warehouse during the time period of the burglaries, explaining that some of the items were unique to Fox Lane Furniture.

Thereafter, Mr. Collins contacted Sergeant Jones and disclosed that the defendants had moved some of the stolen furniture to Extra Space Storage. Once again, furniture items stolen from the Fox Lane Furniture warehouse were found in the units along with empty furniture boxes. Police officers also located some of the stolen items at a flea market in a booth leased to Mr. Shives. Mr. Landshof provided a detailed inventory of the furniture recovered estimated at $76,913 for the items recovered from the Whittaker Drive residence and $89,944 for the items and empty boxes recovered from the Extra Space Storage units. This evidence supports the jury's finding Defendant Mitchell guilty of theft of property valued over $60,000.

Defendant Mitchell relies on his testimony that he did not know the furniture was stolen in asserting that the evidence was insufficient. As previously stated, "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. The jury heard Defendant Mitchell's testimony about his purchase of the furniture from "Chris" and, by its verdict, found the State's witnesses' account more credible than Defendant Mitchell's theory of the case.

Accordingly, we conclude that there is sufficient evidence to support the jury's finding that Defendant Mitchell is guilty beyond a reasonable doubt of theft of property valued at more than $60,000. Defendant Mitchell is not entitled to relief.

## B. Admission of Testimony About Gang Affiliation

Defendant Mitchell asserts that Sergeant Jones's reference to his alleged gang affiliation was character evidence and inadmissible under Tennessee Rule of Evidence 404(b). He acknowledges that he did not object at trial nor was this issue raised in his motion for new trial and asks this Court to review the admission of this testimony under plain error review. The State responds that the Defendant has not met his burden of demonstrating the existence of plain error.

The Tennessee Rules of Criminal Procedure explain that "plain error [,] . . . [a]n error which has affected the substantial rights of an accused [,] may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). We have said that "[w]hether or not an appellate court should recognize the error and grant relief . . . depend[s] upon the facts and circumstances of the particular case." *State v. Ogle*, 666 S.W.2d 58, 61 (Tenn. 1984).

As we previous discussed, *Adkisson* held that the following five factors must be present for a finding of plain error:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

899 S.W.2d at 641-42 (footnotes omitted). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Smith*, 24 S.W.3d at 283.

At trial, during cross-examination of Sergeant Jones, Defendant Mitchell's attorney asked Sergeant Jones about her knowledge of a "beef" between Mr. Schoefield and Defendant Norfleet. The exchange proceeded as follows:

Q:      What was the beef that Schoefield had with Mr. Norfleet?

A:      I wasn't aware that there was a beef.

Q:      Mr. Schoefield never told you anything about the beef?

A:      No. No, he just said that he did not want to be identified because he said [Defendant] Mitchell was in a Gangster - - was a Gangster Disciples or something, that's the only thing that I have on that.

Q:      Lavell Mitchell?

A:      Nope, he did not say Mr. Lavell Mitchell.  He was basically saying that [Defendant] Mitchell.

Q:      He said that?  Mr. Schoefield said that?

A:      Yes.

Q:      But you didn't protect his identity, did you?

A:      No, because eventually, you know, I mean, he came in and gave us a statement.

In the case under submission, it is clear that all five factors have not been established.  We acknowledge that the admission of this statement was in violation of Tennessee Rule of Evidence 404(b) that proscribes character evidence.  In light of the evidence presented at trial, however, we cannot conclude that consideration of this error is necessary to do substantial justice.  In our view Sergeant Jones' statement regarding gang affiliation on cross-examination was in response to repeated questioning about the content of his interview with Mr. Schoefield, and not intended to prove Defendant Mitchell's propensity to commit these crimes.  Further, we note the overwhelming evidence of the Defendant Mitchell's participation and guilt in these crimes presented at trial.  Therefore, Defendant Mitchell has not shown that consideration of the error is necessary to do substantial justice.

Accordingly, because a defendant must establish all five factors for plain error review and we have concluded that he has not met his burden as to showing that consideration is necessary to do substantial justice, Defendant Mitchell is not entitled to relief as to this issue.

29

## 3. Restitution

Defendant Mitchell contends that the trial court erred by failing to consider his ability to pay when ordering restitution payments of $250 a month. The State responds that the trial court properly considered Defendant Mitchell's ability to earn a living while serving a probation sentence.

When a defendant challenges the restitution amount ordered by the trial court, this Court will utilize an abuse of discretion standard of review with a presumption that the trial court's ruling was reasonable. *See State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012); *see also State v. David Allen Bohanon*, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *4 (Tenn. Crim. App., at Nashville, Oct. 25, 2013), *no Tenn. R. App. 11 application filed* (concluding that "the appropriate standard of review for restitution orders is the abuse of discretion standard with a presumption of reasonableness"). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). Furthermore, the defendant bears the burden of demonstrating the impropriety of the sentence. See T.C.A. § 40-35-401 (2014), Sentencing Comm'n Cmts; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991).

Tennessee Code Annotated section 40-20-116 mandates restitution of either the property or, if that is not possible, the value of the property in cases in which a defendant has been convicted of "stealing or feloniously taking or receiving property[.]" T.C.A. § 40-20-116(a) (2014). The purpose of ordering restitution is to compensate the victim and to punish and rehabilitate the defendant. *State v. Johnson*, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997).

While there is no set formula for determining restitution, above all, the restitution amount must be reasonable. *State v. Smith*, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). When ordering restitution, the trial court must base the amount on the pecuniary loss to the victim. T.C.A. § 40-35-304(b) (2010); *Smith*, 898 S.W.2d at 747. The amount of restitution ordered, however, "does not have to equal or mirror the victim's precise pecuniary loss." *State v. Mathes*, 114 S.W.3d 915, 919 (Tenn. 2003) (quoting *Smith*, 898 S.W.2d at 747). "Pecuniary loss" is statutorily defined as "[a]ll special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant." T.C.A. § 40-35-304(e)(1) (2010). "Special damages" are "the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case. . . ." *State v. Lewis*, 917 S.W.2d 251, 255 (Tenn. Crim. App. 1995) (quoting Black's Law Dictionary 392 (6th ed.1990)).

Tennessee law mandates that "[i]n determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform." T.C.A. § 40-35-304(d) (2014). This is because "[a]n order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim." *Johnson*, 968 S.W.2d at 886.

At the time of sentencing, the court must specify "the amount and time of payment or other restitution to the victim and may permit payment or performance in installments." T.C.A. § 40-35-304(c) (2014). Where a defendant is sentenced to supervised probation, as in this case, "any payment or performance schedule established by the court shall not extend beyond the expiration date [of the sentence imposed]." *Id*. § 40-35-304(g)(2). In other words, the court must set a restitution amount that the defendant can reasonably pay within the time that he will be under the trial court's jurisdiction. *Smith*, 898 S.W.2d at 747

Theft is a Class B felony "if the value of the property or services obtained is sixty thousand dollars ($60,000) or more but less than two hundred fifty thousand dollars ($250,000)." T.C.A. § 39-14-105(a)(4). In this case, the trial judge sentenced Defendant Mitchell to eight years, suspended after the service of ten months and twelve days in jail to ten years supervised probation, and ordered Defendant Mitchell to pay restitution in the amount of $250 per month beginning ninety days after his release from jail.

The trial court heard the arguments of counsel regarding restitution and stated that it had reviewed the presentence report. The presentence report reflects that Defendant Mitchell reported being in good mental and physical health and had no substance abuse issues. Defendant Mitchell reported that he had been self-employed since 2009 and testified consistently about his employment at trial. The trial court expressed concern about Defendant Mitchell's ability to pay and then listened to responses from both Defendant Mitchell's attorney and the State. In ordering restitution, the trial court stated:

> I'm not going to require a specific amount for him to pay. But I'm going to require you pay starting ninety days after his release, he's going to have to get a job, he's going to have to pay two hundred fifty dollars a month.

> And if he can't, if he's arrested on a warrant, then he'll have to show me proof why he can't get a part-time job making that money. . . .

The judgment order and the probation order in the record indicate restitution in the amount of $250.00 a month with a total amount of $166,857.00.

We conclude that the trial court did consider Defendant Mitchell's ability to pay in setting the restitution amount. As previously stated, however, when establishing the proper amount in restitution owed, the trial court should base the figure on what the defendant can reasonably be expected to pay within the time that he is under the jurisdiction of the trial court. T.C.A. § 40-35-304(d) (2010); *Smith*, 898 S.W.2d at 747. Furthermore, the payment schedule is not to exceed the term of the sentence imposed. T.C.A. § 40-35-304(c), (g)(2); *see also State v. Daniel Lee Cook*, No. M2004-02099-CCA-R3-CD, 2005 WL 1931401, at *4 (Tenn. Crim. App., at Nashville, Aug. 10, 2005), *no Tenn. R. App. P. 11 application filed* (concluding that there was no way the appellant could pay $9,000 in restitution at a rate of $150 per month during a sentence of eleven months and twenty-nine days).

Here, Defendant Mitchell received a ten year supervised probation sentence, and the trial court ordered him to pay $250.00 per month to satisfy the $166,857.00 in pecuniary loss sustained by the victim. Although the trial court said at the sentencing hearing that it would not set an amount, a restitution amount of $166,857.00 is shown on the judgment form. This created a situation in which Defendant Mitchell could comply with the order of restitution by making the minimum payments of $250.00 each month, while simultaneously violating the order by not paying the full amount of $166,857.00 during the ten year probated sentence. *See, e.g., State v. John Tyler Gilley*, No. E2011-01627-CCA-R3-CD, 2012 WL 4358731, at *5 (Tenn. Crim. App., at Knoxville, Sept. 25, 2012), *no Tenn. R. App. P. 11 application filed* (concluding that $9,370.00 at a rate of $90.00 per month was an improper amount of restitution to be paid during four years of probation). While it is true that any unpaid portion of court-ordered restitution may be converted to a civil judgment, the amount ordered in the first place must be reasonable and in accordance with statutory requirements. T.C.A. § 40-35-304(h)(1); *Smith*, 898 S.W.2d at 747.[3] Based on the record as a whole, we conclude that the trial court ordered $250.00 per month in restitution for a total of $30,000, after finding that the victim had suffered $166,857.00 in pecuniary loss. Therefore, we remand the case for correction of the judgment form to distinguish between the restitution amount ordered, $30,000.00 ($250.00 per month for ten years) and the pecuniary loss to the victim, $166,857.00, thereby providing a payment schedule and restitution amount which can be completed during the term of Defendant Mitchell's probation.

## 4. Cumulative Effect of the Errors

---

[3] We also note that, for any amount of the total value of the property stolen not included in the amount of restitution, the trial court may establish the deficiency amount, which is subject to collection by execution. *See* T.C.A. § 40-20-116(a); *State v. Ardie Mae Culbreth*, No. M2007-01157-CCA-R3-CD, 2008 WL 2796467, at *2 (Tenn. Crim. App., at Nashville, July 21, 2008), *no Tenn. R. App. P. 11 application filed*.

32

Lastly, Defendant Mitchell contends that the cumulative effect of the errors in this case deprived him of a fair trial. Having considered each of the issues on appeal and concluding that the trial court erred in only one respect, the payment schedule for restitution, we need not consider the cumulative effect of the alleged errors. *State v. Hester,* 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments but remand the case for entry of a corrected judgment pertaining to Defendant Mitchell's restitution.

_____

ROBERT W. WEDEMEYER, JUDGE